Filed 8/11/16  P. v. Hodge CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B264853 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA016955-02) |
| v. | |
| RICHARD S. HODGE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Richard R. Romero, Judge.  Affirmed.

Sean K. Kennedy, Center for Juvenile Law and Policy, Loyola Law School, Los Angeles, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Shawn McGahey Webb and Andrew S. Pruitt, Deputy Attorneys General, for Plaintiff and Respondent.

**INTRODUCTION**

In 1996, a jury convicted defendant Richard S. Hodge of a special-circumstance murder and a second-degree robbery he committed when he was 17 years old. The trial court sentenced Hodge to life imprisonment without parole (LWOP), plus 10 years to run consecutively for the robbery conviction and a firearm enhancement. In 2013, Hodge filed a petition for a writ of habeas corpus in the superior court, requesting the court resentence him in accordance with *Miller v. Alabama* (2012) 567 U.S. —, 132 S.Ct. 2455, 183 L.Ed.2d 407 (*Miller*). In 2015, the same judge who presided over Hodge's original trial and sentencing hearing ruled on Hodge's petition, vacated Hodge's LWOP sentence, and conducted a new sentencing hearing. After considering the factors discussed in *Miller*, the court reimposed Hodge's LWOP sentence.

On appeal, Hodge contends it was reversible error for the same judge who originally sentenced him to rule on his habeas petition and preside over his new sentencing hearing, relying on Penal Code[1] section 859c and *Fuller v. Superior Court* (2004) 125 Cal.App.4th 623 (*Fuller*). Hodge also contends the court erred in its application of *Miller* when deciding to reimpose his LWOP sentence. He requests we vacate his sentence and remand for a new sentencing hearing before a different judge. We affirm.

**BACKGROUND**

**1.     The Carjacking and Murder**

On August 9, 1993, Hodge and then eighteen year old Virgil Clarke decided to steal a car. Around 7:00 a.m. that morning, Hodge and Clarke approached a car parked near Long Beach Polytechnic High School (Poly), where they were students. Catherine Tucker, the school's crossing guard, was sitting in the car's front seat reading the newspaper. Hodge walked toward the driver's side of the car while Clarke approached the passenger's side. When Tucker turned to look at Hodge, Hodge shot her in the head, killing her. Hodge and Clarke then moved Tucker's body toward the center

---

[1]     All undesignated statutory references are to the Penal Code.

2

console of the car and covered it with Tucker's newspaper. Hodge drove the car to an alleyway where they dumped Tucker's belongings into the street and moved her body to the trunk. Hodge then drove to the Los Angeles River, where he and Clarke tried to dispose of Tucker's body; however there were too many people near the river, so they left Tucker's body in the trunk and returned to Poly.

During his first-period class, Hodge passed a note to his friend, Dionisio Kepa, explaining that he "killed this bitch." He asked Kepa to meet him after class. Later that day, Hodge, Clarke, and Kepa left campus in Tucker's car. Shortly after leaving campus, Hodge crashed the car into a bus. Hodge, Clarke, and Kepa abandoned the car and fled the scene, but they were arrested shortly after the accident.

Immediately after he was arrested, Hodge denied shooting Tucker. He claimed that he and Clarke decided to take Tucker's car because they found it with the front window down, the keys in the ignition, and no one in the front seat. Hodge told the police the gun was already on the floorboard when he and Clarke entered the car. However, when Hodge arrived at the police station, he admitted he had had the gun "for some time," and that he had used it to shoot Tucker. Hodge told the police he shot Tucker because he "wanted the car."

### 2. The Charges, Trial, and Verdict

Hodge was charged with first-degree murder (§ 187, subd. (a)) and second-degree robbery (§ 211). The People alleged Hodge committed the murder while engaged in the robbery (§ 190.2, subdivision (a)(17)(A)). As to the murder and robbery charges, the People alleged a principal actor was armed with a firearm (§ 12022, subdivision (a)(1)), and that Hodge personally used a firearm while committing the crimes (§ 12022.5, subd. (a)).

Hodge testified at trial. He recanted the statements he made earlier to the police admitting he shot Tucker. He claimed that on the morning of August 9, 1993, Clarke showed up at his house around 6:30 a.m. to show him a car that Clarke had stolen earlier that morning. When Hodge looked inside the car, he saw Tucker's body in the passenger seat. Clarke told Hodge he had accidentally shot Tucker, claiming the gun

3

"went off" as he approached Tucker's car. Hodge decided to help Clarke dispose of Tucker's body, so he drove Tucker's car to an alleyway in Long Beach, where they removed most of Tucker's possessions from the car and placed Tucker's body in the trunk. Hodge then drove Tucker's car to school, and he and Clarke went to class. During his first-period class, Hodge wrote Kepa a note saying he had "a problem" and needed to meet after class to talk about it. Hodge denied writing a note to Kepa admitting he had killed someone.

When questioned about why he had told the police he killed Tucker, Hodge claimed he had agreed to take the blame for the murder and robbery because he was only 17 years old at the time of the crimes, while Clarke was already 18 years old. Hodge believed that since he was a minor, he would receive only "juvenile time" and stay in prison until he was 25 years old, as opposed to Clarke, who would likely have to spend the rest of his life in prison if convicted of murder.

The jury convicted Hodge of first-degree murder and second-degree robbery. It found true the special-circumstance allegation that Hodge committed the murder while engaged in the robbery. The jury also found true both firearm allegations.

### 3. Hodge's Original Sentence

Before the sentencing hearing, the court referred Hodge to the California Youth Authority (Youth Authority) to be evaluated for his amenability to training and treatment offered by the organization. In April 1996, following a 60-day evaluation, the Youth Authority produced a report finding Hodge would be amenable to training and treatment. The Youth Authority recommended Hodge be placed in an age-appropriate rehabilitation facility.

On May 2, 1996, the court conducted Hodge's sentencing hearing. The court considered the Youth Authority's amenability report and heard argument from Hodge's counsel requesting the court exercise its discretion under section 190.5 to sentence

4

Hodge to 25 years to life in prison instead of LWOP.[2] The court rejected counsel's request and sentenced Hodge to LWOP on his first-degree murder conviction. The court explained its decision as follows. "Under Penal Code section 190.5, I don't believe it is appropriate to basically stay the special circumstance finding of true by the jury. [¶] Based on the circumstances of the offense, the planning involved, vulnerability of the victim, the execution style shooting of the victim, I don't believe it's appropriate to stay or strike the special circumstance finding. [¶] So far as circumstances in aggravation, the victim was particularly vulnerable in her vehicle at that hour. The defendant's crime here, both crimes were planned, not impulsive, involve another as a lookout. There is added culpability for involving another. [¶] The defendant at the time and shortly after the offenses showed no remorse, no emotional effect. [¶] In mitigation, he has no record of violence and now does show remorse. [¶] The circumstances in aggravation outweigh those in mitigation." The court then imposed a consecutive five-year term for the personal-use firearm allegation and a consecutive five-year term for the second-degree robbery conviction, for a total sentence of LWOP plus 10 years.[3]

---

[2]    Section 190.5 provides in relevant part: "The penalty for a defendant found guilty of murder in the first degree, in any case in which one or more special circumstances enumerated in Section 190.2 or 190.25 has been found to be true under Section 190.4, who was 16 years of age or older and under the age of 18 years at the time of the commission of the crime, shall be confinement in the state prison for life without the possibility of parole or, at the discretion of the court, 25 years to life." (§ 190.5, subd. (b).)

[3]    Hodge appealed from the court's original judgment, arguing that under section 654, the court should have stayed imposition of the consecutive five-year term for his robbery conviction. In a nonpublished opinion (*People v. Hodge* (April 18, 1997, B103959)), we modified Hodge's sentence to stay imposition of the consecutive five-year term, reducing Hodge's total sentence to LWOP plus five years. We otherwise affirmed the judgment.

### 4. The Habeas Petition

On July 25, 2013, Hodge filed a petition for a writ of habeas corpus in the trial court, challenging the constitutionality of his LWOP sentence in light of *Miller*. Hodge argued he was entitled to a new sentencing hearing at which the court must allow him to present mitigating evidence relevant to the factors discussed in *Miller* that must be considered before imposing LWOP on a juvenile offender. In their response to Hodge's petition, the People conceded Hodge was entitled to a new sentencing hearing. The People also conceded that section 1170, subdivision (d)(2), which allows a prisoner who was sentenced to LWOP as a juvenile to petition the trial court for recall of sentence and resentencing after he or she has served 15 years of that sentence, did not provide an adequate remedy to challenge the constitutionality of an LWOP sentence imposed on a juvenile offender before *Miller* was decided.

### 5. The New Sentencing Hearing and Hodge's Mitigating Evidence

On April 13, 2015, the same judge who presided over Hodge's trial and original sentencing hearing vacated Hodge's LWOP sentence on the murder conviction and granted Hodge a new sentencing hearing.[4] In support of his request for a non-LWOP sentence, Hodge filed a sentencing memorandum and statement in mitigation of punishment, supported by more than 150 pages of exhibits, including Hodge's original sentencing memorandum filed in 1996, the Youth Authority's amenability report filed in 1996, and statements and reports from three experts recommending Hodge receive a non-LWOP sentence.

Efty Sharony, a Senior Mitigation Specialist and Social Worker for Loyola Law School's Center for Juvenile Law and Policy, submitted a written report and provided unsworn testimony at Hodge's new sentencing hearing. In preparing her report and testimony, Sharony interviewed Hodge, Hodge's mother and father, Clarke, and Hodge's high-school girlfriend, Kim Sutton. Sharony also reviewed the Youth Authority's amenability report filed in 1996, Hodge's records from the California

---

[4] The court did not vacate Hodge's five-year term for the firearm allegation.

6

Department of Corrections and Rehabilitation (Department of Corrections), Hodge's mental health records, and the records from Hodge's trial. Sharony's report and testimony outlines Hodge's youth and family background.

Hodge grew up in Pittsburgh, Pennsylvania, where he lived with his mother and younger brother. Hodge's father, who suffered from Schizophrenia and abused drugs and alcohol, sometimes lived with the family, but he would disappear for extended periods of time. He was absent for much of Hodge's childhood and did not provide financial support for the children. Hodge's father also was abusive toward Hodge's mother, often physically and sexually assaulting her in front of the children, but he never physically or sexually abused Hodge or Hodge's brother.

Hodge attended school in Pittsburgh through the seventh grade. Around the time he entered the eighth grade, Hodge moved with his mother and brother to Long Beach. While in Long Beach, Hodge's family would often rely on government aid for support, and they frequently lived in government-subsidized housing. At one point, Hodge's family lived in an apartment complex that was controlled by the Rolling 20s Crips street gang. Although he never joined a gang, Hodge became friends with some gang members. Hodge's brother also began associating with gang members, and he was arrested several times. After arriving in Long Beach, Hodge's mother moved the family to at least eight different apartments in a six-year period due to the family's financial struggles and Hodge's brother's behavioral problems.

Before his sophomore year of high school, Hodge transferred to Poly. Hodge joined the school's ROTC program, where he met Clarke, who was a member of the Rolling 20s Crips. Clarke usually carried a gun, and he would often get into fights. Hodge looked up to Clarke and relied on him for protection.

During his sophomore year of high school, Hodge developed a serious romantic relationship with Kim Sutton. In April 1993, Kim cheated on Hodge with one of Hodge's friends. Kim's relationship with Hodge's friend, which lasted for several months, was difficult for Hodge to cope with. Nevertheless, Hodge continued to date Kim. Clarke often ridiculed Hodge for continuing to see Kim, and he would often

7

encourage Hodge either to beat up the friend who was seeing Kim or to stop talking to Kim.

As a teenager, Hodge suffered several concussions, some of which temporarily changed his demeanor. When Hodge was 15 years old, he suffered a concussion after he was thrown from his bicycle during a collision with a car. Hodge's mother recalled that his behavior changed after the accident. He became aggressive and short-tempered, which, according to Hodge's mother, was out of character compared to his good-natured demeanor before the accident. Hodge also suffered a concussion after he was struck in the head with the butt of a rifle during ROTC practice.

Prior to killing Tucker, Hodge had never been involved in any reported incidents of violence, and he did not have a criminal history. According to Hodge's mother, Hodge generally had a fun-loving and people-pleasing attitude. Kim described Hodge as quiet, artsy, and affectionate. Clarke described Hodge as " 'not rough.' " He told Sharony that Hodge did not like to fight and that it was out of character for Hodge " 'to do something like this,' " referring to the murder and carjacking. Sharony opined that based on Hodge's lack of a prior history of violent or criminal misconduct, Hodge was likely motivated by peer pressure to participate in the carjacking with Clarke. Sharony believed that Clarke, whom Hodge looked up to, was pressuring Hodge to act like a man after Kim cheated on him. According to Sharony, Hodge decided to go along with the carjacking because he believed he needed to impress Clarke, and he wanted to compensate for his own feelings of low self-esteem.

Dr. Barry Krisberg, an expert in criminology, submitted a declaration in support of Hodge's sentencing memorandum. In preparing his declaration, Dr. Krisberg reviewed Hodge's records from the Department of Corrections, Hodge's habeas petition, and the documents supporting the petition.

Hodge's behavior in prison has been positive. During his nearly 20 years of incarceration, Hodge has had very few disciplinary charges, and he has not engaged in any significant violent conduct. Hodge also has participated in anger-management and drug-rehabilitation programs, and he earned his GED while housed with the Youth

8

Authority before his transfer to the Department of Corrections. Hodge is well-liked by the Department of Corrections staff, who often describe him as "polite and respectful." Dr. Krisberg concluded that, in light of Hodge's good behavior in prison, which corroborates the Youth Authority's prior determination that Hodge would be amenable to training and treatment, and the fact that Hodge was under the age of 18 at the time he committed the homicide, reimposing an LWOP sentence would be unreasonable.

Dr. Barbara Counter, a clinical and forensic psychologist, submitted a psychological evaluation report in support of Hodge's sentencing memorandum. In preparing her report, Dr. Counter interviewed Hodge in March 2015 and reviewed Hodge's social history report, Hodge's original sentencing memorandum, the Youth Authority's amenability report, and Hodge's records from the Department of Corrections.

According to Dr. Counter, Hodge was less culpable at the time of Tucker's murder due to his age, and he has since demonstrated a capacity to change based on his good behavior over the course of nearly twenty years in prison. Dr. Counter opined that, at the time of Tucker's murder, Hodge exhibited signs of "Adolescent Brain Development," which is associated with the following behavioral indicators: immature behavior; criminal behavior; poor judgment and decision making; an inability to consider alternative courses of action; a heightened proclivity for risk taking; poor future orientation; impulsivity; and difficulty in making decisions that are beneficial to one's long-term interests. Dr. Counter also believed the concussions Hodge suffered prior to Tucker's murder had stifled his brain's development, in turn increasing his desire to engage in dangerous and risk-taking behavior as a teenager. Dr. Counter recommended Hodge receive a non-LWOP sentence based on his "diminished culpability at the time of the crime, as well as his hardiness, resilience, developing insight and proven ability to grow, change and learn from life experiences."

Hodge also addressed the court at the sentencing hearing. He attributed his participation in the murder and carjacking to the absence of a father figure during his childhood and adolescence, as well as his impressionability as a teenager. According to

9

Hodge, he "let go of [his] moral compass" when he allowed Clarke to convince him to participate in the carjacking. Hodge took responsibility for shooting Tucker and expressed remorse for killing her.

Defense counsel acknowledged Hodge was a full participant in Tucker's murder and did not try to minimize Hodge's responsibility. However, counsel argued that in order for the court to reimpose LWOP on Hodge, it would have to find he was incorrigible and irreparably corrupt at the time of the murder and carjacking, something counsel claimed the court could not find based on Hodge's youth and post-conviction behavior. Counsel pointed out that, despite growing up in an unstable household with no father figure, Hodge had no criminal record or any documented negative interactions with law enforcement before Tucker's murder, and he was never a member of a criminal street gang. Counsel asserted Hodge had shown signs of rehabilitation by taking responsibility and expressing remorse for killing Tucker.

The prosecutor argued *Miller* did not require the court to impose a non-LWOP sentence for Hodge's murder conviction. The prosecutor asserted Hodge did not act impetuously when he committed the murder and carjacking. Hodge, not Clarke, had possession of the gun when Clarke posed the idea of stealing a car. Hodge acted according to a plan, and he was the one who used the gun during the crime. The prosecutor focused on how Hodge killed Tucker in an execution manner and showed no remorse shortly after killing her, moving her body to the trunk of her car, driving her car with her body still in it to and from his high school, and bragging about killing her to another student at his school. The prosecutor acknowledged Hodge had a difficult upbringing, but he contended Hodge's background did not mitigate against reimposing an LWOP sentence in light of Hodge's callous and calculated behavior before, during, and after he murdered Tucker.

In deciding whether to reimpose an LWOP sentence on Hodge, the court stated it was aware of, and would weigh, the *Miller* factors relevant to making such a determination. The court also stated that in making its determination, it would not

10

take into account the fact that, even if he were resentenced to LWOP, Hodge could ask the Governor to commute his sentence, or ask the Parole Board to release him on parole.

The court described its application of the *Miller* factors to Hodge's case as follows: "I do take into account the evidence presented by the defense, including the statement and report of specialist Efty Sharony and the California Youth Authority amenability determination at the time of sentencing, plus the other declarations by the defense experts, Barry Krisberg, and so forth, and their opinion stating that [Hodge] is amenable to change and acted immaturely and with impetuosity at the time of this offense. I do acknowledge that. [¶] It is true that [Hodge] came from a dysfunctional family without a father figure to raise him, was exposed to violence, lived in a neighborhood dominated or affected by criminal gang activity. I note the abuse of alcohol, the tendency to give in to peer pressure, the issues with the girlfriend at the time. [¶] Jumping to the fourth factor, we have no evidence about any plea negotiations that might have occurred had the [prior defense] sought that – not these counsel here.[5] [¶] So I do take into account under what might be called the fifth factor all the information regarding the possibility of rehabilitation. [¶] What I need to do in this instance is determine Mr. Hodge's character at the time of the offense. So that is the determinative matter for me to decide, and I do agree with the District Attorney, although I don't adopt the term 'heinous,' because this offense at the time of its commission was such that it did demonstrate a callousness on the part of Mr. Hodge. He did act in cold blood. He was repentant at the time of the original sentencing and now certainly is, but until then he was not. He was the actual shooter. There are no impetuosities as shown by the facts because this was a desire to have a car available for private use. It was not sophisticated, plainly. Taking the body to school, showing it to others was clearly an invitation to be discovered by the police. So I agree with the

---

[5]   Although the record from Hodge's trial reflects the prosecution offered Hodge 30 years to life in state prison in exchange for pleading guilty to first-degree murder and the firearm allegation, Hodge's counsel did not mention the offer in Hodge's new sentencing memorandum or bring it to the court's attention at the hearing.

11

D.A. that the conduct post the commission demonstrates that he was concerned about the effects of the offense, he knew what he had done at the time, and although 17, was acting in a mature fashion."

The court concluded: "All these facts, under all the considerations of [*People v. Gutierrez* (2014) 58 Cal.4th 1354 (*Gutierrez*)] and *Miller*, require me to consider, I do find that at the time of the commission of that offense, the time of the original sentencing, Mr. Richard Hodge unfortunately is, was incorrigible, irreparably, and is not amenable to change." The court then reimposed Hodge's LWOP sentence for his murder conviction.

Hodge filed a timely appeal.

## DISCUSSION

Hodge raises two primary contentions on appeal. First, he argues it was reversible error for the same judge who presided over his trial and original sentencing hearing to rule on his habeas petition and conduct his new sentencing hearing, relying on section 859c and *Fuller*. Second, he argues that, even if the trial court's procedure for handling his habeas petition was correct, the court misapplied *Miller* when it reimposed his LWOP sentence.

### 1. Hodge was not prejudiced by the procedure used by the trial court to rule on his habeas petition

In July 2013, Hodge filed a habeas petition in the superior court, requesting a new sentencing hearing in light of *Miller*. The same judge who presided over Hodge's trial and imposed Hodge's original sentence granted Hodge's petition and conducted the new sentencing hearing. Hodge never objected to that judge ruling on his petition or presiding over his new sentencing hearing. Nevertheless, he contends this was reversible error under section 859c and *Fuller*.

Section 859c provides: "Procedures under this code that provide for superior court review of a challenged ruling or order made by a superior court judge or a magistrate shall be performed by a superior court judge other than the judge or magistrate who originally made the ruling or order, unless agreed to by the parties."

*Fuller* held it is improper under section 859c for the same superior court judge who denied a defendant's motion to dismiss a misdemeanor complaint to hear the defendant's habeas petition challenging that ruling. (*Fuller*, *supra*, 125 Cal.App.4th at pp. 626-628.) *Fuller* did not, however, address whether section 859c applies to *post-conviction* habeas petitions.

The Law Revision Commission's commentary on section 859c is instructive. (See *HLC Properties, Ltd. v. Superior Court* (2005) 35 Cal.4th 54, 62 [the Law Review Commission's official comments are entitled to substantial weight when interpreting a statute].) The Commission's Official Comments state that section 859c was enacted to "accommodate unification of the municipal courts and superior courts." (Cal. Law Revision Com. com., 50 West's Ann. Pen.Code (2008 ed.) foll. § 859c, p. 410.) In its recommendation to the Legislature, the Commission explained that section 859c is intended to prevent a superior court judge from reviewing a preliminary ruling he or she issued as a municipal court judge prior to reunification, such as a ruling on a motion to dismiss under section 995 or a motion to suppress under section 1538.5. (See Recommendation on Trial Court Unification: Revision of Codes (July 1998) 28 Cal. Law Rev. Com. Rep. (1998) pp. 68, 422 <http://www.clrc.ca.gov/pub/Printed-Reports/Pub198.pdf>, last viewed August 9, 2016.) As *Fuller* explained, section 859c continues to apply to prohibit a superior court judge from reviewing his or her own preliminary ruling on such motions. (*Fuller*, *supra*, 125 Cal.App.4th at pp. 625-628.) Hodge has cited no authority, and our own research has revealed no case law or other authority, extending section 859c to post-conviction habeas petitions. In any event, even assuming section 859c does apply to Hodge's petition, any error in the court's procedure was harmless because Hodge received the relief he requested in his petition, namely an order vacating his original sentence and granting a new sentencing hearing.

To the extent Hodge contends it was also error for the same judge to preside over his new sentencing hearing, we disagree. It is generally the preferred practice for the original trial judge to preside over post-conviction proceedings that "involve matters necessarily relevant and material to the issues involved in the original action," such as a

13

new sentencing hearing. (See *Yokley v. Superior Court* (1980) 108 Cal.App.3d 622, 628.) The reason for this is simple: the original trial judge is the most familiar with the facts and procedure of the case, placing him or her in "the best position to pass upon the questions involved" in the subsequent proceeding. (See *Paredes v. Superior Court* (1999) 77 Cal.App.4th 24, 30, quoting *Jacobs v. Superior Court* (1959) 53 Cal.2d 187, 191.) Here, the judge who presided over Hodge's trial and original sentencing hearing was in the best position to consider whether to reimpose Hodge's LWOP sentence under the direction of *Miller*, since, as explained below, the *Miller* analysis is dependent in part on the facts established at the original trial. Thus, it was proper for the same judge who presided over Hodge's trial and imposed Hodge's original sentence to conduct the new sentencing hearing.

> **2. The trial court applied *Miller* properly when it reimposed Hodge's LWOP sentence**

> **A. Juvenile offenders, LWOP, and the Eighth Amendment**

The Eighth Amendment guarantees "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." (U.S. Const., 8th Amend.) This means that punishment for crime " 'should be graduated and proportioned to [the] offense.' [Citation.]" (*Roper v. Simmons* (2005) 543 U.S. 551, 560, 125 S.Ct. 1183, 161 L.Ed.2d 1 (*Roper*).) What constitutes "cruel and unusual" punishment under the Eighth Amendment is a fluid concept that is determined by looking not only to historical conceptions, but also to " ' "the evolving standards of decency that mark the progress of a maturing society." ' [Citations.]" (*Graham v. Florida* (2010) 560 U.S. 48, 58, 130 S.Ct. 2011, 176 L.Ed.2d 825 (*Graham*).)

Since Hodge was sentenced to LWOP in 1996, the United States Supreme Court has issued three decisions expanding on the Eighth Amendment's application to juvenile offenders. Beginning with *Roper*, the court held death sentences for juvenile offenders violate the Eighth Amendment. (*Roper*, *supra*, 543 U.S. at p. 578.) Five years later, the court decided *Graham*, holding the Eighth Amendment bars the imposition of LWOP on juvenile offenders convicted of nonhomicide offenses.

14

(*Graham*, *supra*, 560 U.S. at p. 82.) Most recently, in *Miller*, the court further limited the application of LWOP to juvenile offenders, holding the Eighth Amendment prohibits sentencing schemes that mandate LWOP for a juvenile convicted of a homicide offense. (*Miller, supra*, 132 S.Ct. at pp. 2464, 2469.)

Underlying all three of these decisions is the court's recognition that significant differences exist between adult and juvenile offenders for purposes of sentencing. (*Miller, supra,* 132 S.Ct. at p. 2464 [recognizing that "children are constitutionally different from adults for purposes of sentencing"], citing *Roper*, *supra*, 543 U.S. at p. 569 and *Graham*, *supra*, 560 U.S. at p. 68.) "First, children have a ' "lack of maturity and an underdeveloped sense of responsibility," ' leading to recklessness, impulsivity, and heedless risk-taking. [Citation.] Second, children 'are more vulnerable . . . to negative influences and outside pressures,' including from their family and peers; they have limited 'contro[l] over their own environment' and lack the ability to extricate themselves from horrific, crime-producing settings. [Citation.] And third, a child's character is not as 'well formed' as an adult's; his traits are 'less fixed' and his actions less likely to be 'evidence of irretrievabl[e] deprav[ity].' [Citation.]" (*Miller*, *supra*, 132 S.Ct. at p. 2464.) These "distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." (*Id*. at p. 2465.)

In concluding a mandatory LWOP sentence for a juvenile offender violates the Eighth Amendment, the Supreme Court in *Miller* also looked to the application of the death penalty to adult offenders – specifically, the requirement that a sentencing court or jury make an individualized determination that the death penalty is an appropriate sentence for each defendant in a capital case before he or she may be sentenced to death. (*Miller*, *supra*, 132 S.Ct. at pp. 2466-2470.) The court reasoned that because LWOP is tantamount to a death sentence for a juvenile offender, the Eighth Amendment requires the sentencing court to make an individualized determination that LWOP is a suitable sentence for the juvenile offender before such sentence may be imposed. (*Ibid.*)

The court in *Miller* outlined five factors that generally will be relevant to the individualized determination that must be performed before a juvenile offender may be sentenced to LWOP. (*Miller*, *supra*, 132 S.Ct. at pp. 2468-2469.) Those factors are: (1) the juvenile's "chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences"; (2) "the family and home environment that surrounds [the juvenile]—and from which [the juvenile] cannot usually extricate himself—no matter how brutal or dysfunctional"; (3) "the circumstances of the homicide offense, including the extent of [the juvenile's] participation in the conduct and the way familial and peer pressures may have affected him"; (4) whether the juvenile "might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, [the juvenile's] inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys"; and (5) "the possibility of rehabilitation," including the extent or absence of the juvenile's criminal history. (*Id*. at p. 2468; see also *Gutierrez*, *supra*, 58 Cal.4th at pp. 1388-1389.)

Although the court in *Miller* declined to declare all LWOP sentences for juveniles unconstitutional, it cautioned that such sentences should be appropriate only in rare circumstances. The court stated: "[G]iven all we have said in *Roper, Graham*, and this decision about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon. That is especially so because of the great difficulty we noted in *Roper* and *Graham* of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' [Citations.] Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Miller*, *supra*, 132 S.Ct. at p. 2469, fn. omitted.)

16

In California, section 190.5 provides the sentencing framework for juveniles convicted of crimes eligible for sentences of death and LWOP. Subdivision (a) prohibits the imposition of the death penalty on any offender who was under the age of 18 at the time the crime was committed. (§ 190.5, subd. (a).) Subdivision (b) gives the court discretion to sentence a juvenile who was over the age of 16 at the time he or she committed a special-circumstance murder to LWOP or 25 years to life in prison. (§ 190.5, subd. (b).)

Prior to *Miller*, California Courts of Appeal and trial courts interpreted section 190.5, subdivision (b), to create a presumption in favor of imposing LWOP on qualifying juvenile offenders. (*Gutierrez*, *supra*, 58 Cal.4th at pp. 1360, 1369-1370.) However, in *Gutierrez*, the California Supreme Court reexamined section 190.5 and held that when properly construed, the statute does not create a presumption in favor of imposing LWOP on qualifying juvenile offenders. (*Id*. at pp. 1371, 1387.) Rather, the statute requires a sentencing court to consider the *Miller* factors before imposing such a sentence on a juvenile. (*Id*. at p. 1387.)

The court in *Gutierrez* explained the sentencing court's role under section 190.5, subdivision (b). "[T]he trial court must consider all relevant evidence bearing on the 'distinctive attributes of youth' discussed in *Miller* and how those attributes 'diminish the penological justifications for imposing the harshest sentences on juvenile offenders.' [Citation.] To be sure, not every factor will necessarily be relevant in every case. For example, if there is no indication in the presentence report, in the parties' submissions, or in other court filings that a juvenile offender has had a troubled childhood, then that factor cannot have mitigating relevance. But *Miller* 'require[s] [the sentencer] to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.' [Citation.]" (*Id*. at p. 1390, second alteration in original.) Relevant evidence of the "distinctive attributes of youth" includes evidence of postconviction rehabilitation, such as a defendant's good behavior in prison since he or she was sentenced to LWOP as a juvenile. (*People v. Lozano* (2016) 243 Cal.App.4th 1126, 1137-1138.)

17

In determining whether to impose LWOP on a juvenile offender, the sentencing court is not required to give more weight to any one of the *Miller* factors. (*People v. Palafox* (2014) 231 Cal.App.4th 68, 73 (*Palafox*); see also *id*. at p. 90 [the court in *Miller* did not hold that the possibility of rehabilitation outweighs any of the other four factors].) Rather, the court, in exercising its discretion, may "give such weight to the relevant factors as it reasonably determines is appropriate under all the circumstances of the case." (*Id*. at p. 73.) "Whether a punishment is cruel and/or unusual is a question of law subject to our independent review, but underlying disputed facts must be viewed in the light most favorable to the judgment." (*Id*. at p. 82.)

## B. Analysis

Hodge argues his LWOP sentence is unconstitutional because the court applied the *Miller* factors in an unreasonable manner. Specifically, Hodge contends the court ignored evidence that before trial he rejected a plea offer for a sentence more favorable than LWOP, thereby failing to apply the fourth *Miller* factor. Hodge also asserts the court erroneously refused to consider evidence of his post-conviction conduct in prison. Finally, Hodge contends the court erred in applying *Miller* because it gave too much weight to evidence of the circumstances of Tucker's murder and Hodge's demeanor at the time of the crime, while giving insufficient weight to mitigating evidence, including evidence that Hodge had no criminal record at the time of his conviction and had shown signs of rehabilitation since being incarcerated. In other words, Hodge argues no reasonable sentencing court could have sentenced him to LWOP under the circumstances of his case.

### i. Evidence of Hodge's pre-trial rejection of the prosecution's plea offer

Hodge contends the court made a factual error when it applied the fourth *Miller* factor, which requires a sentencing court to consider whether because of his or her youth, a juvenile offender was unable to negotiate with the prosecution or rejected a plea offer that would have resulted in a conviction for a lesser offense than what the juvenile was convicted of at trial. (*Miller*, *supra*, 132 S.Ct. at p. 2468; see also

18

*Gutierrez, supra*, 58 Cal.4th at p. 1389.) Specifically, Hodge asserts the court erroneously found there was no evidence that he received a plea offer for a more favorable sentence before trial. Although the record from Hodge's trial reflects that such an offer was made, Hodge has forfeited any claim that the court erred by not considering evidence of the offer because he failed to bring that evidence to the court's attention at his new sentencing hearing.

Before voir dire in Hodge's trial, the prosecutor informed the court that the People had offered Hodge 30 years to life in prison if he would plead guilty to first-degree murder and the firearm allegation. The prosecutor indicated the offer would remain on the table through the opening stages of voir dire. Presumably, Hodge did not accept the People's offer, since his case proceeded to trial. However, there is nothing in the record from the trial demonstrating why Hodge did not accept the offer. In addition, Hodge did not argue in his new sentencing memorandum that his receipt of an offer for a life sentence with the possibility of parole mitigated against imposing an LWOP sentence, and his counsel at the new sentencing hearing did not bring that fact to the court's attention. In fact, in his memorandum filed before the new sentencing hearing, Hodge stated, albeit incorrectly, that the record from his trial does not reflect whether he was offered a plea deal.

"Ordinarily, a criminal defendant who does not challenge an assertedly erroneous ruling of the trial court in that court has forfeited his or her right to raise the claim on appeal." (*In re Sheena K.* (2007) 40 Cal.4th 875, 880 (*Sheena K.*).) For example, when a defendant fails to raise a factual issue in the trial court, he forfeits any claim on appeal that the court erred by failing to consider that issue before making its challenged ruling. (See *People v. McCullough* (2013) 56 Cal.4th 589, 597-598.) This rule applies in the context of sentencing. (*Sheena K.*, *supra*, 40 Cal.4th at p. 881.)

Here, Hodge forfeited his claim that the court made a mistake of fact when applying the fourth *Miller* factor because he failed to bring to the court's attention evidence that the prosecution had offered him a plea deal prior to trial. In addition, Hodge contributed to the court's failure to consider evidence of the plea deal by stating

19

in his sentencing memorandum that the record from his trial does not reflect whether he was offered a plea deal. (See *People v. Perez* (1979) 23 Cal.3d 545, 549, fn. 3 ["The doctrine of invited error applies to estop a party from asserting an error when 'his own conduct *induces the commission of error*' "].)

### ii. Evidence of Hodge's post-conviction rehabilitation

Hodge next contends the court erred by categorically refusing to consider evidence of his post-conviction rehabilitation, including evidence of his positive behavior in prison. We disagree. It is clear from the record that the court admitted evidence of Hodge's post-conviction conduct and considered that evidence in deciding to reimpose LWOP.

When deciding whether to impose LWOP on a juvenile offender, a sentencing court must consider "all relevant evidence bearing on the 'distinctive attributes of youth' . . . and how those attributes 'diminish the penological justifications for imposing the harshest sentences on juvenile offenders.' [Citation.]" (*Gutierrez*, *supra*, 58 Cal.4th at p. 1390.) In *Lozano*, our colleagues in Division Five held that evidence of a defendant's post-conviction rehabilitation bears on the "distinctive attributes" of the defendant's youth. (*Lozano*, *supra*, 243 Cal.App.4th at pp. 1137-1138.) Thus, under *Miller* and *Gutierrez*, a sentencing court cannot categorically exclude such evidence when determining whether to reimpose LWOP on a defendant who was convicted of the underlying crime as a juvenile. (*Ibid.*) Because the sentencing court in *Lozano* categorically excluded what the defendant asserted was evidence of 15 years of rehabilitation in prison, the defendant's LWOP sentence was reversed and the case remanded for a new sentencing hearing at which the defendant could present evidence of post-conviction rehabilitation. (*Ibid.*)

Here, the court properly admitted and considered evidence of Hodge's post-conviction conduct. Prior to his new sentencing hearing, Hodge submitted over 150 pages of exhibits, consisting of expert reports, declarations and other documents, that he claimed mitigated against imposing LWOP. Many of those documents addressed Hodge's conduct following his 1996 conviction, including his generally

20

positive conduct in prison and his statements accepting responsibility and expressing remorse for killing Tucker. The court admitted all of Hodge's exhibits at the sentencing hearing. Later, when explaining its rationale for reimposing Hodge's LWOP sentence, the court stated it took into account the documents submitted by Hodge.

Despite the court stating it considered evidence of Hodge's post-conviction conduct, Hodge contends the court did not in fact consider such evidence. Hodge points out the court later stated it needed to "determine Mr. Hodge's character at the time of the offense." Hodge interprets this statement to mean the court believed "only post-offense rehabilitation evidence available *at the time of the original sentencing* could be properly considered" at Hodge's new sentencing hearing. (Emphasis in Hodge's brief.) We disagree with Hodge's interpretation. We interpret the court's statement as acknowledging it was required to determine the appropriateness of Hodge's sentence in light of the fact that he was a juvenile when he committed the special-circumstance murder. (See *Gutierrez*, *supra*, 58 Cal.4th at pp. 1385-1387; *Lozano*, *supra*, 243 Cal.App.4th at pp. 1137-1138.) That does not mean, however, the court disregarded evidence of Hodge's post-conviction conduct. As discussed above, the court stated earlier during the sentencing hearing that it did take into account such evidence when it applied the *Miller* factors to Hodge's case. To read the court's latter statement as Hodge urges us to do would contradict and nullify the court's earlier statement without any support in the record to do so.

### iii.    The court's weighing of the *Miller* factors

Finally, Hodge argues the court erred in applying *Miller* because it gave too much weight to the circumstances of Tucker's murder and his demeanor around the time of the crime, and it did not give sufficient weight to the circumstances of his youth and evidence of his good behavior in custody following his conviction. He contends the facts of his case do not support a determination that he is the rare, irreparably corrupt juvenile offender for whom an LWOP sentence is appropriate. (See *Miller*, *supra*, 132 S.Ct. at p. 2469.)

21

A similar argument was rejected in *Palafox*. There, the defendant was convicted of two counts of first-degree murder when he was sixteen years old. (*Palafox*, *supra*, 231 Cal.App.4th at pp. 73, 81.) After considering mitigating evidence, including the defendant's age, his lack of a criminal record, evidence of his generally good-natured demeanor before the crime, and an expert's report detailing the neglect he experienced as a child and other risk factors he grew up with, the trial court sentenced him to two terms of life imprisonment without the possibility of parole. (*Id*. at pp. 75-81.) On appeal, the defendant argued his sentence was unconstitutional because the trial court had not ruled out the possibility that he could be rehabilitated in the future. (*Id*. at p. 90.)

In affirming the defendant's sentence, the reviewing court in *Palafox* examined the nature of a sentencing court's discretion under *Miller* and section 190.5 when deciding whether to impose LWOP on a juvenile offender. The court recognized that while the Supreme Court in *Miller* cautioned that LWOP would be appropriate only in the rare circumstance where a juvenile offender is irreparably corrupt, the Supreme Court did not hold that any one of the factors outlined in *Miller* must take precedence over any of the other factors. Rather *Miller* requires only " 'that a sentencer follow a certain process—considering an offender's youth and attendant characteristics— before imposing a particular penalty.' [Citation.]" (*Id*. at p. 91, quoting *Miller*, *supra*, 132 S.Ct. at p. 2471.) Thus, a sentencing court exercising its discretion under section 190.5 may afford whatever weight it reasonably determines appropriate to each of the *Miller* factors in light of the circumstances of the case. (*Palafox*, *supra*, 231 Cal.App.4th at pp. 81-82, 91-92.) Because the trial court considered all of the relevant evidence and carefully weighed the applicable *Miller* factors, the reviewing court in *Palafox* could not conclude the trial court abused its discretion in imposing LWOP on the juvenile defendant. (*Id*. at p. 91.)

We reach the same conclusion here. In deciding whether to reimpose Hodge's LWOP sentence, the court stated it was aware of the factors discussed in *Miller* and *Gutierrez*, it considered all of the mitigating evidence Hodge submitted in support of his

request for a non-LWOP sentence, and it weighed that evidence under each applicable factor.  In exercising its discretion under *Miller* and section 190.5, the court was not required to give more weight to evidence of Hodge's post-conviction conduct than the circumstances of Tucker's murder and evidence of Hodge's demeanor around the time of the crime.  (*Palafox*, *supra*, 231 Cal.App.4th at pp. 91-92.)  The court's decision to reimpose Hodge's LWOP sentence was not an abuse of discretion. [6]

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

LAVIN, J.

WE CONCUR:

EDMON, P. J.                                  ALDRICH, J.

---

[6]      We note that in its respondent's brief, the People include a footnote stating Hodge "has not pursued the statutory remedy provided by section 1170, subdivision (d)(2)."  The People do not argue that section 1170, subdivision (d)(2), renders moot Hodge's instant appeal, and they do not otherwise explain why they have included the footnote in their brief.  In his reply brief, Hodge addresses the footnote, arguing that section 1170, subdivision (d)(2), does not provide an adequate remedy in lieu of a new sentencing hearing for a juvenile sentenced to LWOP before *Miller* was decided.  We agree.  In *Gutierrez*, the California Supreme Court held that section 1170, subdivision (d)(2), does not remedy an LWOP sentence imposed on a juvenile offender without consideration of the factors discussed in *Miller*.  (See *Gutierrez*, *supra*, 58 Cal.4th at pp. 1384-1387.)