Filed 1/14/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B263640 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA023984) |
| v. | |
| ELIZABETH LOZANO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Richard R. Romero, Judge. Reversed and remanded.

Post-Conviction Justice Project, University of Southern California, Gould School of Law, Michael J. Brennan and Heidi L. Rummel, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General and Michael Katz, Deputy Attorney General, for Plaintiff and Respondent.

_____

Defendant Elizabeth Lozano, when 16 years old, participated in the murder of 13-year-old Tayde Vasquez. In 1996, Lozano was sentenced to life in prison without the possibility of parole (LWOP) after being convicted by jury of first degree murder with the special circumstance of murder during the commission of robbery. Based on the intervening decision in *Miller v. Alabama* (2012) 567 U.S. ___ [132 S.Ct. 2455, 183 L.Ed.2d 407] (*Miller*), and with the agreement of the prosecution, the trial court vacated the LWOP sentence and conducted a new sentencing hearing in 2015. At the new sentencing hearing, the court ruled inadmissible Lozano's proffered evidence of her conduct in prison—initially incorrigible but for the most recent decade indicative of rehabilitation—and again sentenced Lozano to LWOP. Our Supreme Court in *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1389 (*Gutierrez*) held that, under *Miller*, "a sentencing court must consider any evidence or other information in the record bearing on 'the possibility of rehabilitation'" before imposing an LWOP sentence on a juvenile who kills. We therefore conclude the trial court erred in excluding Lozano's evidence of rehabilitation in prison, and reverse and remand for a new sentencing hearing.

## PROCEDURAL BACKGROUND

Lozano was convicted by jury of first degree murder (Pen. Code, § 187)[1] and second degree robbery (§ 211). The jury found true a special circumstance allegation that the murder was committed during the commission of a robbery (§ 190.2, subd. (a)(17)) and that a principle was armed with a firearm (§ 12022, subd. (a)(1)). Lozano was sentenced to LWOP plus six years. On appeal, this court modified the judgment to require a section 654 stay of the punishment on the robbery conviction, but otherwise affirmed. (*People v. Lozano* (June 12, 1997, B106665 [nonpub. opn.].) A petition for review was denied.

---

[1] Statutory references are to the Penal Code unless otherwise stated.

2

On May 21, 2013, Lozano filed a petition for writ of habeas corpus, arguing that her LWOP sentence violated the Eighth Amendment as interpreted in *Miller*. The district attorney agreed that Lozano was entitled to a new sentencing hearing, without conceding that the LWOP sentence was unconstitutional. The trial court vacated the original LWOP sentence, conducted a new sentencing hearing, and again sentenced Lozano to LWOP. This appeal follows.

## STATEMENT OF FACTS FROM LOZANO'S PRIOR APPEAL

On January 26, 1992, defendant was 16 years old. Tayde Vasquez was 13 years old. Defendant was a member of the T-Town Flats street gang, which is associated with the Barrio Pobre street gang. Vasquez was not a gang member. Defendant came to Vasquez's house and invited her to go out. Vasquez accepted. Vasquez was wearing a lot of jewelry. The two girls were met by Steven Green, Frankie Aragon, and Gabriel Littlejohn. Green and Aragon were members of the Eastside Longo street gang, a rival of Barrio Pobre. Littlejohn was not a gang member.

The group went to the beach. Littlejohn asked Vasquez why defendant was associating with rival gang members. Vasquez replied that defendant was setting Green and Aragon up for an ambush. Littlejohn reported this information to Green. Green confronted defendant, who denied any such intent. Defendant feared reprisals if Vasquez were to inform defendant's fellow gang members that she had been associating with rival gang members. Defendant threatened to take care of Vasquez. Aragon gave defendant a gun. Defendant stated she wanted to assault Vasquez and rob her of her jewelry.

The group dropped Littlejohn off at his home and drove to a park. While Aragon waited at the car, Green and defendant walked into the park with Vasquez. Defendant told Green she wanted to rob Vasquez. Defendant demanded Vasquez's jewelry. Defendant told Vasquez she was robbing her because she had informed on her. Vasquez refused to surrender her jewelry to defendant. Defendant fought with Vasquez and then shot her twice in the head at point blank range, killing her. Defendant and Green returned

3

to the car.  Defendant told Aragon that she had fought with Vasquez over the jewelry. After the murder, defendant and Green returned to Littlejohn's house.  Defendant had Vasquez's jewelry and told Littlejohn that she had killed Vasquez when Vasquez had refused to surrender her jewelry.  Aragon had someone dispose of the murder weapon.

In separate proceedings, Green was convicted of the murder and robbery of Vasquez, and Aragon was convicted of being an accessory.  Green testified that he alone had been responsible for the killing of Vasquez and he had taken her jewelry merely as an afterthought.

## THE 2015 SENTENCING HEARING

Lozano filed a statement in mitigation of punishment prior to the 2015 sentencing hearing, supported by in excess of 300 pages of exhibits.  The exhibits demonstrated that Lozano engaged in serious misconduct during her first four years in prison, including a conviction for conspiracy to transport a controlled substance resulting in a six-year prison sentence.  Lozano did not receive any disciplinary violations in the following 15 years in prison.  Among the exhibits Lozano proffered to show her amenability to rehabilitation were the following:  Lozano earned her GED and an AA college degree; a laudatory declaration from a former warden of the California Institution for Women; various certificates of completion of vocational courses; participation in numerous self-help programs related to alcohol and substance abuse and coping skills; participation in programs involving the consequences of criminality on victims, participation and leadership in programs relating to juvenile offenders; election to the inmate council that works in conjunction with prison administration; participation in an outreach program to prevent juveniles from participating in crime, including personal communication with some participants; and over 30 laudatory comments from prison staff including descriptions of her transformation from an immature inmate to a person dedicated to helping others avoid the mistakes that lead to her incarceration.

4

The prosecution filed a resentencing memorandum in support of an LWOP sentence, arguing in part that consideration of Lozano's postconviction conduct was inappropriate at the new sentencing hearing. The prosecution also argued that Lozano had an alternative remedy of presenting the evidence in a petition for resentencing under section 1170, subdivision (d)(2),[2] which permits a juvenile sentenced to LWOP (with exceptions not relevant here) to petition the sentencing court for "recall and resentencing" after serving at least 15 years in prison where the defendant "has performed acts that tend to indicate rehabilitation or the potential for rehabilitation . . . ."

In oral argument before the trial court, the prosecution took the position that *Miller* and *Gutierrez* preclude consideration of postconviction conduct on the issue of a juvenile killer's amenability to rehabilitation. The prosecutor argued sentence should be imposed based on the circumstances present at the time of the initial sentencing hearing in 1996. Lozano's counsel replied that Lozano was not opposed to the court looking at her poor behavior in prison, along with her later conduct demonstrating the potential for rehabilitation. The prosecutor expressed the view that the required resentencing "basically turns back the clock to the initial day of sentencing" and "post-sentence conduct by the defendant doesn't come into play . . . ." The prosecutor continued, "there's another mechanism entirely where you can start looking at the inmate's conduct, and that would be under [section] 1170 [subdivision] (d)(2)."

Counsel for Lozano responded that the prosecutor's approach "sort of undermines all the purposes of the rationale of *Miller* and *Gutierrez*." The rationale for exclusion of evidence of bad conduct is not a matter of relevance, it is a recognition that a juvenile put

---

[2] Subject to circumstances not present in this case, a defendant who was under the age of 18 at the time of an offense resulting in a sentence of LWOP may petition the sentencing court for recall and resentencing with a statement that the "defendant has performed acts that tend to indicate rehabilitation or the potential for rehabilitation, including, but not limited to, availing himself or herself of rehabilitative, educational, or vocational programs, if those programs have been available at his or her classification level and facility, using self-study for self-improvement, or showing evidence of remorse." (§ 1170, subd. (d)(2)(B)(iv).)

in a position of hopelessness by an LWOP sentence is unlikely to rehabilitate, but that does not answer the question of whether there is a potential for rehabilitation. Counsel argued most cases involve little or no postconviction information, but Lozano has been in prison for nearly 20 years, and "the actual evidence of the rehabilitation has to be the most relevant and probative evidence available."

The trial court ruled that it was required "to go back in time" and sentence Lozano as the facts existed at the time of the original sentencing hearing in 1996. As a result, the court ruled all evidence of Lozano's postconviction conduct in prison was inadmissible.

The trial court proceeded to the issue of what sentence should be imposed, first considering victim impact statements from members of Vasquez's family on the issue of sentencing. Vasquez's brother, Jose, spoke of how the pain of his sister's murder did not go away and his belief that the original LWOP sentence was proper. Jose told the court that no one can understand the impact of a murder until it happens to a family member. Vasquez's niece, Leanae, was just 18 months younger than Vasquez. There is no closure for her. She misses Vasquez, whom she described as a good person. Raymond, Vasquez's brother, asked the court for justice for his sister. Vasquez's sister, Sarah, spoke on her own behalf and for other family members. Sarah was incarcerated when Vasquez was killed and feels responsibility for not being there for her. She has gone to the park where the murder took place and has read the trial transcripts, trying to imagine what occurred. Sarah described the parts of her life, and her family's life, that Vasquez would not share. She requested the original sentence be imposed again.

Defendant presented three witnesses. Her cousin, Celia, explained that she had spent a great deal of time with Lozano before the murder. Lozano was the oldest sibling and she took care of her five younger brothers. Celia, like Lozano, was sexually molested by their uncle Alejandro. Lozano addressed the court, detailing her life history leading up to the murder of Vasquez, including physical abuse by her mother and sexual abuse by her uncle, having the responsibility from an early age to provide care for her five younger brothers, the separation of her parents, her poor adjustment to school, and turning to alcohol and a gang to cope with the issues she faced. Lozano explained how

6

Vasquez was killed. Lozano said she fled to Mexico for several years after the murder before returning to the United States while pregnant. Lozano told the court she accepted responsibility for Vasquez's murder. Richard Lozano, one of Lozano's brothers, described the violent neighborhood in which the family lived. He corroborated Lozano's statement regarding consistent physical abuse and her responsibility for raising her younger brothers. The family moved to Mexico to escape the dangers in the neighborhood.

After considering the arguments of counsel, the trial court stated that it understood its discretion and that there was no presumption in favor of an LWOP sentence. The court analyzed the case under the factors set forth in *Miller*. The court acknowledged Lozano's age, her dysfunctional family, the neglect she suffered, her alcohol abuse, how she turned to a gang for support, and her flight to Mexico to avoid the gang and its dangers. The court noted Lozano's lack of gang activity upon return to the United States. However, the court viewed Lozano as "the driving force here in the death of a very young child; that the child in a way looked up to her and no doubt trusted her." The court believed Lozano lured Vazquez to a place of ambush where the victim had no possibility of assistance. The court stated, "I do not see a possibility of rehabilitation," and again sentenced Lozano to LWOP.

## DISCUSSION

Lozano makes two arguments on appeal. She first contends the LWOP sentence in this case violates the Eighth Amendment's prohibition against cruel or unusual punishment. Second, Lozano argues the trial court's categorical exclusion of evidence of postconviction behavior, including that demonstrating amenability to rehabilitation, violates the Eighth Amendment. We conclude the second contention has merit, and therefore do not consider the first. The cause must be remanded for a new sentencing hearing in which the court considers Lozano's evidence, as well as clarifying or rebuttal evidence offered by the prosecution.

7

*United States Supreme Court Authority Decided After Lozano's Original Sentence*

Lozano was sentenced to LWOP in 1996. The United States Supreme Court subsequently issued a trio of decisions concerning the application of the Eight Amendment[3] to juvenile offenders.

*Roper v. Simmons* (2005) 543 U.S. 551, 578 (*Roper*) held that "[t]he Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed." *Graham v. Florida* (2010) 560 U.S. 48, 82 (*Graham*) held that "[t]he Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide." *Graham* noted that "*Roper* established that because juveniles have lessened culpability they are less deserving of the most severe punishments." (*Id*. at p. 68.) "[W]hen compared to an adult murderer, a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability. The age of the offender and the nature of the crime each bear on the analysis." (*Id*. at p. 69.)

"What the State must do, however, is give defendants like Graham some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. It is for the State, in the first instance, to explore the means and mechanisms for compliance. It bears emphasis, however, that while the Eighth Amendment prohibits a State from imposing a life without parole sentence on a juvenile nonhomicide offender, it does not require the State to release that offender during his natural life. Those who commit truly horrifying crimes as juveniles may turn out to be irredeemable, and thus deserving of incarceration for the duration of their lives. The Eighth Amendment does not foreclose the possibility that persons convicted of nonhomicide crimes committed before adulthood will remain behind bars for life. It does

---

[3] The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

prohibit States from making the judgment at the outset that those offenders never will be fit to reenter society." (*Graham*, *supra*, 560 U.S. at p. 75.)

"Graham deserved to be separated from society for some time in order to prevent what the trial court described as an 'escalating pattern of criminal conduct,' . . . but it does not follow that he would be a risk to society for the rest of his life. Even if the State's judgment that Graham was incorrigible were later corroborated by prison misbehavior or failure to mature, the sentence was still disproportionate because that judgment was made at the outset. A life without parole sentence improperly denies the juvenile offender a chance to demonstrate growth and maturity. Incapacitation cannot override all other considerations, lest the Eighth Amendment's rule against disproportionate sentences be a nullity." (*Graham*, *supra*, 560 U.S. at p. 73.)

*Miller*, *supra*, 132 S.Ct. at page 2460, held "that mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'" The *Miller* holding impacts persons such as Lozano, because "since *People v. Guinn* (1994) 28 Cal.App.4th 1130 (*Guinn*), section 190.5(b)[4] has been construed by our Courts of Appeal and trial courts as creating a presumption in favor of life without parole as the appropriate penalty for juveniles convicted of special circumstance murder." (*Gutierrez*, *supra*, 58 Cal.4th at p. 1360.) *Gutierrez* held, in part, that section 190.5, subdivision (b), properly construed, does not create a presumption in favor of LWOP. (*Id*. at pp. 1371-1372.)

The *Miller* court declined to declare all LWOP sentences unconstitutional for juveniles convicted of murder. "Our decision does not categorically bar a penalty for a class of offenders or type of crime—as, for example, we did in *Roper* or *Graham*. Instead, it mandates only that a sentencer follow a certain process—considering an

---

[4] Section 190.5, subdivision (b), provides as follows: "The penalty for a defendant found guilty of murder in the first degree, in any case in which one or more special circumstances enumerated in Section 190.2 or 190.25 has been found to be true under Section 190.4, who was 16 years of age or older and under the age of 18 years at the time of the commission of the crime, shall be confinement in the state prison for life without the possibility of parole or, at the discretion of the court, 25 years to life."

offender's youth and attendant characteristics—before imposing a particular penalty." (*Miller*, *supra*, 132 S.Ct. at p. 2471.)  While not banning LWOP sentences for juveniles who kill, the court observed, "we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon.  That is especially so because of the great difficulty we noted in *Roper* and *Graham* of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.'  (*Roper*, [*supra*,] 543 U.S. at [p.] 573; *Graham*, [*supra*,] 560 U.S. at [pp. 68-69].)  Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Miller*, *supra*, at p. 2469, fn. omitted.)

*Miller* identified the factors the sentencing court must take into account in determining whether a juvenile who killed falls within the "uncommon" case warranting LWOP as an initial sentence.  (See *Gutierrez*, *supra*, 58 Cal.4th at pp. 1388-1389.)  "Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences.  It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional.  It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him.  Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys.  (See, e.g., *Graham*, [*supra*,] 560 U.S. at [p. 78] ("[T]he features that distinguish juveniles from adults also put them at a significant disadvantage in criminal proceedings"); *J.D.B. v. North Carolina* [(2011)] 564 U.S. ___, ___, 131 S.Ct. 2394, 2400-2401, 180 L.Ed.2d 310 (discussing children's responses to interrogation).  And finally, this mandatory punishment disregards

10

the possibility of rehabilitation even when the circumstances most suggest it." (*Miller*, *supra*, 132 S.Ct. at p. 2468.)

### California Supreme Court Application of Miller and Penal Code Section 1170, Subdivision (d)(2)

As noted above, *Gutierrez* held that section 190.5, subdivision (b), does not create a presumption in favor of LWOP for a juvenile defendant convicted of murder with special circumstances. (*Gutierrez*, *supra*, 58 Cal.4th at pp. 1371-1372.) This holding compelled a new sentencing hearing for Lozano, a point never contested by the prosecution.

The Attorney General argued in *Gutierrez* "that section 1170(d)(2) removes life without parole sentences for juvenile offenders from the ambit of *Miller*'s concerns because the statute provides a meaningful opportunity for such offenders to obtain release . . . However, *Graham* spoke of providing juvenile offenders with a 'meaningful opportunity to obtain release' as a constitutionally required alternative to—not as an after-the-fact corrective for—'*making the judgment at the outset* that those offenders never will be fit to reenter society.' (*Graham*, [*supra*, 560 U.S.] at p. 75, 130 S.Ct. 2011, italics added.) . . . . Neither *Miller* nor *Graham* indicated that an opportunity to recall a sentence of life without parole 15 to 24 years into the future would somehow make more reliable or justifiable the imposition of that sentence and its underlying judgment of the offender's incorrigibility 'at the outset.' (*Graham*, [*supra*,] at p. 75.) [¶] Indeed, the high court in *Graham* explained that a juvenile offender's subsequent failure to rehabilitate while serving a sentence of life without parole cannot retroactively justify imposition of the sentence in the first instance: 'Even if the State's judgment that Graham was incorrigible were later corroborated by prison misbehavior or failure to mature, the sentence was still disproportionate *because that judgment was made at the outset.*' (*Graham*, *supra*, 560 U.S. at p. 73, italics added.) By the same logic, it is doubtful that the potential to recall a life without parole sentence based on a future

11

demonstration of rehabilitation can make such a sentence any more valid when it was imposed. If anything, a decision to recall the sentence pursuant to section 1170(d)(2) is a recognition that the initial judgment of incorrigibility underlying the imposition of life without parole turned out to be erroneous. Consistent with *Graham*, *Miller* repeatedly made clear that the sentencing authority must address this risk of error by considering how children are different and how those differences counsel against a sentence of life without parole '*before* imposing a particular penalty.' (*Miller*, *supra*, 567 U.S. at p. ___, 132 S.Ct. at p. 2471, italics added; see *id.* at pp. ___, ___, 132 S.Ct. at pp. 2469, 2475.)" (*Gutierrez*, *supra*, 58 Cal.4th at pp. 1386-1387.)

The *Gutierrez* court rejected the argument that section 190.5, subdivision (b), violates the Eighth Amendment by allowing LWOP sentences without consideration of the sentencing factors in *Miller*. "Section 190.5(b) authorizes and indeed requires consideration of the *Miller* factors." (*Gutierrez*, *supra*, 58 Cal.4th at p. 1387.) "In sum, we hold that the trial court must consider all relevant evidence bearing on the 'distinctive attributes of youth' discussed in *Miller* and how those attributes 'diminish the penological justifications for imposing the harshest sentences on juvenile offenders.' (*Miller*, *supra*, 567 U.S. at p. ___, 132 S.Ct. at p. 2465.) To be sure, not every factor will necessarily be relevant in every case. For example, if there is no indication in the presentence report, in the parties' submissions, or in other court filings that a juvenile offender has had a troubled childhood, then that factor cannot have mitigating relevance. But *Miller* 'require[s] [the sentencer] to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.' (*Id.* at p. ___, 132 S.Ct. at p. 2469.)" (*Gutierrez*, *supra*, at p. 1390.)

*Analysis*

In light of *Miller* and *Gutierrez*, we conclude the trial court could not categorically exclude Lozano's proffered evidence of postconviction rehabilitation. As *Gutierrez*, *supra*, 58 Cal.4th at page 1390, interpreted *Miller,* "the trial court must consider all

12

relevant evidence bearing on the 'distinctive attributes of youth' discussed in *Miller* and how those attributes 'diminish the penological justifications for imposing the harshest sentences on juvenile offenders' (*Miller*, *supra*, 567 U.S. at p. ___, 132 S.Ct. at p. 2465.)" All relevant evidence, in our view, includes what Lozano asserts is 15 years of rehabilitation in prison. Disregard of evidence of rehabilitation, under the circumstances presented here, is inconsistent with the focus required by *Miller* and *Gutierrez*.

The prosecution argued in the trial court that the following portion of *Graham* supports the exclusion of *all evidence* of postconviction behavior in determining if a juvenile should be sentenced to LWOP: "Even if the State's judgment that Graham was incorrigible were later corroborated by prison misbehavior or failure to mature, the sentence was still disproportionate because that judgment was made at the outset." (*Graham*, *supra*, 560 U.S. at p. 73.) The prosecutor reasoned that it would be inequitable to preclude evidence of incorrigible conduct, but permit introduction of evidence indicative of rehabilitation. The *Graham* court did not address whether positive postconviction behavior was admissible. We are skeptical that the court in *Graham* and *Miller*, which went to great lengths to emphasize the importance of considering amenability to rehabilitation before imposition of an LWOP sentence on a juvenile, would permit exclusion of evidence at a resentencing hearing mandated by *Miller* and conducted after nearly two decades of incarceration. In any event, the argument is inconsistent with the broad statement in *Gutierrez*, *supra*, 58 Cal.4th at page 1390, that all relevant evidence of amenability to rehabilitation must be considered at a sentencing hearing.

We reject the Attorney General's argument that Lozano's proper forum for introduction of evidence of postconviction rehabilitation is via a petition for resentencing under section 1170, subdivision (d)(2). *Gutierrez* effectively disposes of this contention in its recognition that amenability to rehabilitation must be considered at sentencing before imposition of an LWOP sentence. (*Gutierrez*, *supra*, 58 Cal.4th at pp. 1386-1387.) Lozano does have a remedy under section 1170, subdivision (d)(2), but that

13

remedy is not exclusive, nor is it a substitute for her Eighth Amendment right to a sentencing hearing considering amenability to rehabilitation in the first instance.

## DISPOSITION

The sentence of life without the possibility of parole is reversed. The cause is remanded to the trial court with directions to hold a new sentencing hearing which includes consideration of Lozano's postconviction efforts at rehabilitation, as well as admissible rebuttal evidence offered by the prosecution.


KRIEGLER, J.

We concur:


TURNER, P. J.


MOSK, J.

14