Filed 7/18/22  P. v. Gomez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ALEJANDRO GOMEZ,<br><br>    Defendant and Appellant. | F080156<br><br>(Super. Ct. No. CF96554298)<br><br>**ORDER MODIFYING OPINION**<br>**[NO CHANGE IN JUDGMENT]** |

**THE COURT:**

It is hereby ordered that the opinion filed herein on June 30, 2022, be modified as follows:

1.  Delete the two paragraphs below part IV of the opinion in their entirety and replace them with the following:

    Although not addressed by the parties, the record shows the trial court sentenced Gomez to a determinate term of one year pursuant to section 12022, subdivision (a)(1), plus LWOP on count 1, and did not impose a sentence on any of the remaining counts. Instead, the court observed that all other counts be stayed pursuant to section 654, so the available sentence was either one year plus LWOP or one year plus 25 years to life.

    The trial court was required to impose a sentence on the section 12022, subdivision (a)(1) enhancement, and as to the remaining counts, to select a term, and then stay execution of the sentence on those counts. (See

*People v. Salazar* (1987) 194 Cal.App.3d 634, 640.) We further observe that the abstract of judgment and minute order from Gomez's resentencing hearing erroneously reflect that a sentence of 25 years to life was imposed on count 1, that neither document reflects what terms were selected on the stayed counts, and that the abstract of judgment fails to show the section 12022, subdivision (a)(1) enhancement was imposed. We will therefore remand the instant case back to the lower court for a full resentencing hearing.

Except for the modification set forth, the opinion previously filed remains unchanged.

This modification does not effect a change in the judgment.

                                                                    SMITH, J.
WE CONCUR:


HILL, P. J.


FRANSON, J.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ALEJANDRO GOMEZ,<br><br>Defendant and Appellant. | F080156<br><br>(Super. Ct. No. CF96554298)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County. Jonathan B. Conklin, Judge.

Kyle Gee, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill and Paul E. O'Connor, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

In 1996, appellant Alejandro Gomez was convicted by jury of first degree murder with special circumstances, among other offenses. He was 17 years old at the time of the offense. Gomez was sentenced to a prison term of life without the possibility of parole (LWOP). In 2019, following proceedings initiated by the filing of a petition for writ of habeas corpus by Gomez, the trial court vacated his sentence and then resentenced him to LWOP.

On appeal from his resentencing hearing, Gomez contends the trial court abused its discretion when it elected to reimpose a sentence of LWOP. The Attorney General contends Gomez's claim has been rendered moot by the enactment of Senate Bill No. 394 (2017-2018 Reg. Sess.) (Senate Bill No. 394), which guarantees all juvenile offenders sentenced under Penal Code section 190.5 an opportunity to receive parole consideration at a youth offender parole hearing after no more than 25 years of incarceration.

We reject the Attorney General's assertion that Gomez's claim of sentencing error is moot. We conclude that Gomez did not meet his burden of demonstrating the trial court abused its discretion in reimposing a sentence of LWOP. However, we conclude that resentencing is required for various sentencing errors discussed in part IV of this opinion. We therefore remand this case back to the lower court for a resentencing hearing. In all other respects, the judgment is affirmed.

## PROCEDURAL HISTORY

On September 25, 1996, Gomez and his codefendant, Frank De Lao, were convicted by jury of first degree murder (Pen. Code,[1] § 187, count 1), two counts of attempted vehicle theft (§§ 664, 10851, subd. (a), count 2 & 3), and three counts of second degree burglary (§ 459, counts 4 through 6.) In addition, the jury found true three special circumstances alleging the murder occurred during the commission of a burglary

---

[1] All undefined statutory citations are to the Penal Code unless otherwise indicated.

(§ 190.2, subd. (a)(17)) and an enhancement alleging Gomez was armed with a firearm in the commission of the murder (§ 12022, subd, (a)(1)).

On November 12, 1996, Gomez was sentenced to LWOP plus one year.

In January 2000, this court's unpublished opinion was filed in *People v. Frank De Lao et al.* (Jan. 19, 2000, F027536 [nonpub. opn.]), affirming the judgment in its entirety, including the jury's true findings on the special circumstances.

On June 21, 2013, Gomez filed a petition for writ of habeas corpus, challenging his LWOP sentence under *Miller v. Alabama* (2012) 567 U.S. 460 (*Miller*), because he was a juvenile at the time of the offense. His petition was granted.

On January 15, 2016, the parties appeared for reconsideration of Gomez's sentence. For reasons not relevant to this appeal, Gomez's case was continued multiple times over the course of the following three years.

On May 15, 2019, defense counsel filed an evidentiary hearing brief detailing Gomez's background and arguing for a mitigated prison sentence.

On May 21, 2019, the prosecutor filed a 70-page sentencing brief. In his brief, the prosecutor set forth a detailed argument and discussion of facts supporting reimposition of a sentence of LWOP.

On August 23, 2019, an evidentiary hearing was held. During the hearing, Dr. Allan G. Hedberg, a forensic psychologist, testified on Gomez's behalf. Dr. Hedberg also prepared three reports for the court's consideration. These reports—dated April 21, 2016, May 18, 2017, and June 11, 2019—were admitted into evidence at the hearing.

On October 11, 2019, Gomez was resentenced to LWOP.

On October 15, 2019, Gomez filed a timely notice of appeal.

3.

*The Underlying Offense*

The following statement of facts is a partial excerpt from this court's unpublished opinion in *People v. Frank De Lao et al.*, *supra*, F027536, which was included in the record on appeal:

At approximately 8:45 p.m. on the evening of Friday, September 29, 1995, Sylvia Yzaguirre and Kevin Waterston entered the underground parking garage of a multifamily residential building located in Fresno on S Street where they shared an apartment. They saw three men, later proven to be De Lao, Gomez and Cruz, leaning against a Corvette which belonged to their neighbor Howard Avery. The inside alarm light was blinking, Waterston and Yzaguirre got into a Toyota Camry and drove out of the garage through the electronically-sensored gate without incident. Believing the three men were attempting to steal Avery's Corvette, Waterston parked nearby and returned to the building. He armed himself with a .22-caliber handgun and found Avery. Avery was not armed.

Waterston and Avery went downstairs to the parking garage and approached the Corvette. Someone had tampered with the vehicle's T-top. Waterston crouched down and yelled to anyone inside the Corvette to came out of the car. Avery heard the sound of squealing tires. A Cadillac, driven by Gomez, passed them; Avery and Waterston jumped out of its way to avoid being hit. The Cadillac rammed the partially open security gate and stopped.

Waterston approached the driver's side of the Cadillac and told Gomez to exit the vehicle with his hands up. Waterston was holding his handgun in his right hand. Gomez put his hands up in the air, but then lowered them, put the car back into drive, and drove into the gate a second time. Waterston and Avery again approached the Cadillac. Waterston crouched down and pointed his gun at the driver's side window. He yelled at Gomez to get out of the car with his hands up. Avery saw De Lao standing in a

4.

flowerbed outside the garage and noticed another man standing behind a brick wall. Avery repeatedly told Waterston to shoot the Cadillac's tires. Avery heard a gunshot and saw Waterston fall back. De Lao had shot Waterston in the head, killing him. Avery went to the ground beside Waterston. De Lao continued firing from outside the garage. He aimed at Avery and said, " 'Punk bitch.' " Avery heard one or two more shots. He picked up Waterston's gun and shot one of the Cadillac's tires. Avery ran to a nearby pillar and then to the elevator area. Avery identified De Lao as the shooter.

Yzaguirre had gone outside onto the balcony of the apartment she shared with Waterston. She heard Waterston shouting, " 'Get out of the car now. Get out of the car now.' " She then saw two males run out of the garage. One hid behind a tree on the sidewalk; the other one stopped at the garage entrance. The man at the entrance said, " 'Bitch. Bitch,' " and pointed a handgun into the garage. He then began firing. She is certain the first shot she heard was fired by this man.

Building resident Peter Fiahlo also heard shouting and a crashing noise and went out onto the balcony of his apartment. He saw two men standing in the complex's driveway. Fiahlo heard one man say, " 'Fuck' " or " 'Fuck you,' " then raise his right hand, aim a handgun into the garage and fire approximately six times. The other man was crouched down looking into the garage. After the shooting stopped, a third person came running out of the garage, and they all ran away.

### The Parties' Briefs and the Evidentiary Hearing

On May 15, 2019, Gomez filed a prehearing sentencing brief citing the presence of various circumstances in mitigation of his sentence. In his brief, Gomez argued that he had a difficult childhood: the family struggled financially, relying on public assistance; his mother had lupus; his father had abandoned the family; and Gomez fell into the gang lifestyle. Gomez claimed he had changed since his incarceration. According to Gomez, he began taking college classes, working as a teaching assistant in the GED program, and he renounced his gang affiliation.

5.

On May 21, 2019, the People filed a sentencing brief in which they argued for reimposition of life without the possibility of parole. In so doing, the prosecutor noted two prison incidents from Gomez's record. In 2013, Gomez got into a physical altercation with another inmate, and both inmates disregarded an order to stop. At least one inmate was injured. In 2015, a riot occurred involving members of the Fresno Bulldogs and other groups. Gomez was an active participant in a three-Bulldogs-on-one attack on an inmate.

At the evidentiary hearing, forensic psychologist Dr. Allan Hedberg testified on Gomez's behalf. Dr. Hedberg had reviewed the sentencing transcript for Gomez's case; this court's opinion affirming Gomez's conviction on direct appeal; and Gomez's Central file (C-file). Dr. Hedberg spent approximately 12 hours interviewing Gomez over the course of six sessions and spoke to Gomez's family members.

Dr. Hedberg opined that adolescent males are psychologically and neurologically different from adult males, and that the human brain does not fully develop until approximately age 25. Further, the judgment of an adolescent male may be impaired by factors such as stress, a poor diet and sleep, drug use, anxiety and depression, and neurological disorders. Dr. Hedberg explained that when the brain is not working efficiently because of these factors, it causes poor judgment, lack of adequate forethought, and impulsivity.

Dr. Hedberg stated that Gomez most likely has intentional deficit disorder, which is a neurological disorder. He further observed that Gomez "was a depressed kid," "[h]e was anxious" and "lived under high levels of stress," his "diet was not well thought through," and "[h]e was on drugs for much of his adolescent years."

Significantly, Gomez's father abandoned the family when Gomez was about four years old, and he did not come back into the family's life until recently. This, in turn, caused "a very high level of stress" which would have caused Gomez to experience anger, depression, anxiety, and would cause him to act impulsively.

The absence of Gomez's father likely overwhelmed Gomez's mother, who had five children. The family subsisted on public assistance. Dr. Hedberg opined that under the circumstances, "[i]t was a highly stressful home[,]" and the development of Gomez's neurological system was slowed as a result. In addition, Gomez's mother had lupus and later developed cancer, which was a difficult time in the family's life.

According to Dr. Hedberg, the absence of a father creates a 70 percent chance of an adolescent ending up in a gang and in prison. Gomez joined a gang when he was an adolescent. The gang became his family, primary support network, and his way of life. By the time of Gomez's commitment offense, he had participated in many carjackings or vehicle thefts.

During Dr. Hedberg's interviews with Gomez, Gomez expressed regret for his crime at least three or four times. Dr. Hedberg opined that Gomez's expressions of remorse appeared to be genuine.

Dr. Hedberg observed that Gomez has made progress while incarcerated, although his progress did not start to occur until 2004. At that point, Gomez's mother had developed cancer and his brother had died. Gomez began attending Narcotics Anonymous and Alcoholics Anonymous meetings and the victim's brother forgave him during a court hearing. During 2014, Gomez began to make significant changes in his life: he married, left the gang, began to participate in church, and began taking various classes. He also started to work as a teacher's aide and he took classes on various subjects, including sensitivity to crime victims.

Dr. Hedberg opined that Gomez is capable of and is in the process of being rehabilitated. He explained that Gomez was in the general population, he had classes he wanted to participate in, and if he were granted a change of status, he would be able to learn computer skills to make himself employable by the time he becomes eligible for parole consideration.

On cross-examination, the prosecutor questioned Dr. Hedberg about multiple rules violations Gomez had incurred during his incarceration, including a planned assault on an inmate in 2017. During the incident, Gomez and another inmate threatened a third inmate to secure payment for a drug debt. The threat suggested that if the inmate did not pay his debt, he would be stabbed. Although the incident is documented in Gomez's C-file, Dr. Hedberg admitted he was not familiar with the incident.

Dr. Hedberg opined that Gomez was capable of rehabilitation. However, Gomez had to prove that he was a trustworthy person; he was committed to doing so, but he was "not there yet."

### The Trial Court's Ruling

On October 11, 2019, the trial court issued its ruling reimposing a sentence of life without the possibility of parole:[2]

> "THE COURT: All right. So -- and getting to that de novo sentencing, the Court's sentencing choice today is one of two: Either I reimpose the life without [parole], or I reduce to 25 years to life. It was made clear at all the prior hearings that even though Mr. Gomez was convicted of underlying counts, they're all 654, so it's either 25 years to life or life without. That being said, the Court today is … tasked with considering which of those to do through two separate lenses, as I understand it; the first is *Miller* and the related cases that address the constitutionality of imposing a life without possibility of parole sentence on an offender who was a juvenile at the time. *Miller* does not prohibit that sentence, but *Miller* prohibits the presumptive life without the possibility of parole and requires the Court to exercise its discretion. *Miller* talks about the fact that it is – 'presumed' is too strong a word. That, in fact, to sentence a juvenile offender to life without the possibility of parole, the Court would be required to upon -- can only be imposed on the rare juvenile offender whose crime reflects irreparable corruption. However, that decision -- the second lens that the Court has to consider today is through *People [v.] Lozano*, that says the Court now does consider all -- and I'm reading from that case, 'All relevant evidence of amenability to rehabilitation, including post-sentence prison conduct.' I'm aware that the sentencing judge, at least the way the Court read the sentence, had some hesitation about imposing a

---

[2] We quote the trial court's ruling in its entirety because Gomez challenges the court's findings on appeal.

life without the possibility of parole upon Mr. Gomez at the time, but the sentencing judge viewed it as a mandatory sentence, which is the problem that brings us here today. But that judge did not have the benefit of looking through the future conduct of Mr. Gomez, and this Court does. And unfortunately, that doesn't enter well to Mr. Gomez's benefit. I've reviewed the files carefully. I've looked at Mr. Gomez's post-sentence conduct, and I am impacted by the final testimony of Dr. Hedberg, and Dr. Hedberg has, I think, significant credibility with this Court based upon -- and both of you, and Dr. Hedberg made some very interesting comments especially towards the end of the sentencing hearing. He was confronted with Mr. Gomez's most recent behavior in the institution, which as Dr. Hedberg said, was not excellent, including abuse -- well, assaultive behavior that Mr. Gomez was involved in. The Court recognizes the dynamic of -- of the prison setting. On the other hand, the Court is also aware of individuals who are able to set that dynamic aside and allow their conduct to reflect true rehabilitation. And to quote Dr. Hedberg, referring to Mr. Gomez, 'He needs to achieve a better sense of trustworthiness, so we, as the community, can have that kind of confidence in him. I think he's committed to it. I think he's on the path of it. He's not there yet.' And then Dr. Hedberg was confronted with the incident I referred to involving an unnamed inmate, and Dr. Hedberg's response was, 'It gives me pause. It's hard to understand that.' Finally, a question was put to Dr. Hedberg, 'Are you willing to say, "Let's run with that," because we suggest -- we see a lot of change in the future. Admittedly, it's really little now, but like was said earlier, you need the soil prepared before the seeds can take root.' And Dr. Hedberg's response was, 'That's an excellent statement.' So that's the Court's greatest concern now is the Court does have the ability to look through post-conduct lens in making its decision, and I find from that, that resentencing is not warranted, that the proposition of life without the possibility of parole is the appropriate sentence given Mr. Gomez's conduct.

"Now, that being said, I want to be very careful on the record that these comments should not be interpreted by a subsequent board of parole hearing that the Court feels Mr. Gomez would never be amenable to release, because then Dr. Hedberg continued that Mr. Gomez has started to show changes, and that's what the parole board should consider. That's beyond the expertise of this Court, so to speak, and Mr. Gomez, I'm directing these comments to you. I know this is not the decision you wanted today. When I started off, as I said, it doesn't matter. The parole board's going to make their own decision, and if I were in the position of the parole board, I would have the advantage of looking at you now, perhaps a year in the future. And if a year in the future, you have proved Dr. Hedberg's words true, that in fact, the seed has been planted, and you are continuing to improve, then I'm hopeful that the board of -- the parole board would look favorably upon your request, but I'm not there.

"So for those reasons, I'm finding, considering the language of both *Miller* and the language of *Lozano*, that, um, this -- the sentence of life without the possibility of parole is the appropriate sentence.

"Now, Ms. Hart, I want to be clear, I've chosen my words intentionally. I believe that *Lozano* makes clear, I -- the Court does consider post-sentence conduct. If -- if this were restricted to the conduct of the offense, and that was the only decision, while that conduct should not be viewed as anything less than reprehensible, it does not appear, standing in and of itself, to meet the language of that rare juvenile offender whose crime reflects irreparable corruption. Mr. Gomez was not the shooter here. He was an active participant and a substantial participant. I say those words clearly, because there's other changes in the law now that that language also is, um, necessary for. But looking forward, for the factors I previously stated, he does then appear to fall in that -- at least now, that category of an -- of a person who has not shown the necessary steps to be reparable, so to speak, and for those reasons, the Court is finding that the sentence of life without the possibility of parole is the appropriate sentence, and technically, I'm resentencing him to that."

## ANALYSIS

### I. Background: Senate Bill No. 394

On October 11, 2017, Senate Bill No. 394 became law, amending section 3051 to add subdivision (b)(4). (Stats. 2017, ch. 684, §§ 1, 1.5.) As amended, the statute provides: "A person who was convicted of a controlling offense that was committed before the person had attained 18 years of age and for which the sentence is life without the possibility of parole shall be eligible for release on parole by the board during his or her 25th year of incarceration at a youth offender parole hearing, unless previously released or entitled to an earlier parole consideration hearing pursuant to other statutory provisions."

### II. Gomez's Claim of Sentencing Error is Not Moot

Preliminarily, the parties disagree as to whether Gomez's claim of sentencing error has been rendered moot by the enactment of Senate Bill No. 394, which guarantees Gomez a youth offender parole hearing. The record shows that Gomez has been parole eligible since August 2019. However, Gomez contends this issue has not been rendered moot because we may grant relief that has practical effect.

10.

He identifies several disadvantageous collateral consequences that attach from a sentence of life without the possibility of parole, including: severe movement and time-of-day restrictions, which make it impossible to attend the majority of self-help programs; limited access to vocational training which may, in turn, limit Gomez's ability to demonstrate his suitability for parole; housing restrictions; and exclusion from consideration for compassionate medical release. (See generally, *People v. Scott* (2016) 3 Cal.App.5th 1265, 1273-1274 ["LWOP prisoners are, for example, foreclosed from vocational training or other programs and rehabilitative services that are available to other prisoners."]; See Cal. Code Regs., tit. 15, § 3375.2, subd. (a)(6) ["An inmate serving a sentence of life without possibility of parole (LWOP) shall not be housed in a facility with a security level lower than Level II, except when authorized by the Departmental Review Board."]; § 1170, subd. (e)(2)(A)-(C) [excluding compassionate release from prisoners sentenced to death or life without the possibility of parole].)

The Attorney General concedes that while there may be collateral consequences to imposition of a sentence of life without the possibility of parole which apply to a juvenile offender, those consequences do not implicate *Miller/Montgomery*[3]. He contends that as a result of the enactment of section 3051, subdivision (b)(4), Gomez's sentence is " 'neither LWOP nor its functional equivalent' [and] 'no *Miller* claim arises.' "

We agree that Senate Bill No. 394 rendered Gomez's constitutional claim moot. " 'By simply transforming the affected sentences to life with parole terms, [section 3051] avoid[s] the *Miller* issues associated with the earlier sentences.' " (*In re Cook* (2019) 7 Cal.5th 439, 449, quoting *In re Kirchner* (2017) 2 Cal.5th 1040, 1054.) "By affording [juvenile offenders] a meaningful opportunity for release, the Legislature has effectively mooted any claim that imposition of life without parole on a juvenile offender violates the Eighth Amendment." (*People v. Ochoa* (2020) 53 Cal.App.5th 841, 850, citing *People v. Franklin* (2016) 63 Cal.4th 261, 279-280.)

---

[3]     *Montgomery v. Louisiana* (2016) 577 U.S. 190 (*Montgomery*).

11.

However, Gomez claims the trial court abused its sentencing discretion under state law. We are not persuaded that his claim of sentencing error under state law is moot.[4] To conclude as much would render any sentencing claim unreviewable for an abuse of discretion.

Further, insofar as Gomez contends the adverse consequences attendant to a sentence of life without the possibility of parole are not limited to a juvenile offender's parole eligibility, courts have recognized a claim is not moot where a successful appeal would ameliorate adverse collateral consequences. An issue is moot when, without fault of the opposing party, an event occurs that renders it impossible for this court to grant a prevailing party any effectual relief. (*People v. DeLeon* (2017) 3 Cal.5th 640, 645; *People v. Valencia* (2014) 226 Cal.App.4th 326, 329 [miscalculation of custody credits moot where the defendant served his entire sentence, had been released from custody, and no fines had been imposed against upon which an excessive time served in custody could apply].)

Conversely, where the court is capable of providing relief to the prevailing party, an issue is not moot. (See *People v. Hernandez* (2017) 10 Cal.App.5th 192, 204 [request for resentencing under Proposition 47 not moot even though the defendant was serving an indeterminate term of 25 years to life and the sentence on the challenged conviction had been stayed]; *People v. DeLong* (2002) 101 Cal.App.4th 482, 484 [appeal of trial errors by a defendant whose conviction was later set aside under Proposition 36 not moot because the defendant is "entitled to an opportunity to clear her name and rid herself of the stigma of criminality"]; *In re Byrnes* (1945) 26 Cal.2d 824, 827 [finding defendant's

---

**4** The Attorney General filed a request for judicial notice of the dockets in the following cases: *People v. Mendoza* (S238032) and *People v. Padilla* (S239454). According to the docket entries in these cases, our Supreme Court dismissed review in both *People v. Mendoza* and *People v. Padilla*, finding review was moot following the enactment of Senate Bill No. 394. We decline the Attorney General's request for judicial notice. The docket entries relied upon by the Attorney General do not inform this court whether the petitioners solely raised constitutional claims, or constitutional and state law claims.

12.

claim not moot even though he had served his full prison term because he is entitled to appeal to clear his name].) Because Gomez's LWOP sentence has prejudicial consequences that could be ameliorated by a successful appeal, we find the Attorney General's assertion of mootness unpersuasive.

## III. Gomez Has Not Demonstrated the Trial Court Abused its Discretion in Resentencing Him to LWOP

Gomez contends the trial court abused its discretion by reimposing LWOP because the court's discretion was not informed by *Montgomery*, *supra*, 577 U.S. 190 and the trial court's sentencing decision was unsupported by both its own comments and the evidence presented at the evidentiary hearing. We disagree for several reasons.

First, the record shows the trial court applied the correct legal standard in finding life without the possibility of parole to be the appropriate sentence. Second, we reject Gomez's assertion that the trial court's own findings support the conclusion that the court erred by reimposing LWOP. Finally, insofar as Gomez suggests no reasonable jurist could have imposed LWOP upon this record, we acknowledge that the facts may warrant a difference of opinion concerning the appropriate sentence. However, a mere difference of opinion is not sufficient to demonstrate an abuse of discretion.

## A. Applicable Law

We review the trial court's sentencing decision for abuse of discretion. (*People v. Sandoval* (2007) 41 Cal.4th 825, 847.) The party challenging the sentence bears the burden of " ' "clearly show[ing] that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review." ' " (*People v. Carmony* (2004) 33 Cal.4th 367, 376-377 (*Carmony*), quoting *People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977-978; accord, *People v. Lee* (2017) 16 Cal.App.5th 861, 866.)

"[A] ' "decision will not be reversed merely because reasonable people might disagree. 'An appellate tribunal is neither authorized nor warranted in substituting its

judgment for the judgment of the trial judge.' " ' " (*Carmony, supra*, 33 Cal.4th at p. 377, quoting *People v. Superior Court (Alvarez)*, *supra*, 14 Cal.4th at p. 978.)  "Taken together, these precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Carmony*, at p. 377.)

**B.    Analysis**

### 1.    The Legal Standard Applied by the Trial Court

Gomez initially contends the trial court failed to apply the appropriate legal standard at the resentencing hearing.  According to Gomez, "the lower court stated that it had decided after 'considering the language of both *Miller* and *Lozano*, that life without the possibility of parole is the appropriate sentence.' "  Gomez contends that following *Montgomery*, the correct standard is " 'whether the juvenile offender's crime reflects *permanent incorrigibility* arising from irreparable corruption.' "

Here, the record shows that the trial court recognized that a sentence of life without the possibility of parole is precluded unless the juvenile offender is found incorrigible.  The court expressly stated:

> "THE COURT:  All right.  So -- and getting to that de novo sentencing, the Court's sentencing choice today is one of two: Either I reimpose the life without [parole], or I reduce to 25 years to life. …  That being said, the Court today is taxed -- tasked with considering which of those to do through two separate lenses, as I understand it; the first is *Miller* and the related cases that address the constitutionality of imposing a life without possibility of parole sentence on an offender who was a juvenile at the time.  *Miller* does not prohibit that sentence, but *Miller* prohibits the presumptive life without the possibility of parole and requires the Court to exercise its discretion.  *Miller* talks about the fact that it is – 'presumed' is too strong a word. That, in fact, to sentence a juvenile offender to life without the possibility of parole, the Court would be required to upon -- *can only be imposed on the rare juvenile offender whose crime reflects irreparable corruption*."  (Italics added.)

The court's ruling makes clear that its conclusion that LWOP was the appropriate sentence was premised upon finding Gomez's crimes and other evidence reflected

14.

" ' "irreparable corruption." ' " (*Montgomery, supra*, 577 U.S. at p. 208.) Given the record, we find unpersuasive Gomez's claim that the trial court failed to apply the correct standard. The record explicitly refutes his claim.

In any event, the United States Supreme Court recently clarified in *Jones v. Mississippi* (2021) ___ U.S. ___ [141 S.Ct. 1307], that under *Miller* and *Montgomery*, in imposing a sentence of life without the possibility of parole, the sentencing court is not required to make a separate factual finding that the offender is "permanently incorrigible," nor is the court required to provide "an on-the-record sentencing explanation with an implicit finding of [the offender's] permanent incorrigibility." (*Jones, supra*, 141 S.Ct. at pp. 1311, 1313, 1318-1319, 1321.) Instead, "[i]n a case involving an individual who was under 18 when he or she committed a homicide, a State's discretionary sentencing system is both constitutionally necessary and constitutionally sufficient." (*Id*. at p. 1313.)

## 2.      The Trial Court's Finding of Permanent Incorrigibility

Next, Gomez contends the trial court abused its discretion in resentencing him to life without the possibility of parole. According to Gomez, the trial court could not have meant to impose LWOP based upon Dr. Hedberg's testimony and comments made by the court itself in issuing its ruling.

To the extent Gomez implies that the court could not have meant to impose a sentence of LWOP based upon its own comments, nothing upon the record suggests the court failed to impose the sentence it deemed appropriate under the circumstances. The court observed that Dr. Hedberg had stated Gomez was "on the path" to demonstrating that he is a trustworthy person, capable of change, but " '*[h]e's not there yet.*' " The court further observed that when confronted with Gomez's 2017 assault on an inmate, Dr. Hedberg stated that the incident 'gives me pause. It's hard to understand that.' "

Based primarily upon Gomez's postconviction conduct, the court concluded "that the proposition of life without the possibility of parole is the appropriate sentence ." The

15.

court's comments support the conclusion that it was not persuaded Gomez was capable of amenability to rehabilitation based upon the evidence presented. Although the court placed considerable emphasis upon Gomez's poor performance in prison, this alone does not demonstrate an abuse of discretion. (*People v. Blackwell* (2016) 3 Cal.App.5th 166, 200 [no particular factor, relevant to the decision whether to impose LWOP on a juvenile who has committed murder, predominates under the law].)

Gomez observes that the court cautioned its "comments should not be interpreted by a [parole board] that the Court feels Mr. Gomez would never be amenable to release, because then Dr. Hedberg continued that Mr. Gomez has started to show changes, and that's what the parole board should consider." However, the court's statement does not support the conclusion that *it* was implicitly finding Gomez was capable of change. We interpret the court's comments as an effort to encourage the Board of Parole Hearings to reach its own conclusions about Gomez's suitability for parole, and not to simply adopt the trial court's findings.

### 3. Reasonable Minds May Disagree as to the Sentence Imposed

Finally, we examine the *Miller* factors and the evidence presented at Gomez's resentencing hearing to determine whether the court's decision was "so irrational or arbitrary that no reasonable person could agree with it." (*Carmony, supra*, 33 Cal.4th at p. 377.) As discussed further below, while many of the *Miller* factors weigh against imposing a sentence of LWOP, Gomez has failed to demonstrate that no reasonable person could agree with the trial court's sentencing decision.

#### a. Chronological Age and Hallmark Features

The first *Miller* factor requires the trial court to "consider a juvenile offender's 'chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences.' [Citations.] *Miller* observed that ' "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds," ' and that 'those findings—of transient

16.

rashness, proclivity for risk, and inability to assess consequences—both lessened a child's "moral culpability" and enhanced the prospect that, as the years go by and neurological development occurs, his " 'deficiencies will be reformed.' " ' [Citations.] *Miller* further noted that 'the science and social science supporting [these] conclusions have become even stronger' in recent years." (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1388 (*Gutierrez*), quoting *Miller, supra*, 567 U.S. at pp. 471-472 & fn. 5, 477.)

Gomez was 17 years old at the time of the commitment offense. Dr. Hedberg testified the male adolescent brain does not fully develop until approximately age 25. However, based upon the fact that Gomez suffered depression, anxiety, high levels of stress, his diet was poor, and in light of the fact that he used drugs throughout his adolescence, his brain development was likely slowed or impaired.

### b. Family and Home Environment

The second *Miller* factor requires the trial court to "consider any evidence or other information in the record regarding 'the family and home environment that surrounds [the juvenile]—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional.' [Citation.] Relevant 'environmental vulnerabilities' include evidence of childhood abuse or neglect, familial drug or alcohol abuse, lack of adequate parenting or education, prior exposure to violence, and susceptibility to psychological damage or emotional disturbance." (*Gutierrez, supra*, 58 Cal.4th at pp. 1388-1389, quoting *Miller, supra*, 567 U.S. at pp. 473, 477.)

According to statements made by Gomez and his family, Gomez was raised under challenging circumstances. His father abandoned the family when Gomez was a child. Gomez's mother and siblings relied upon public assistance as a result. These factors caused Gomez to experience high levels of stress, anger, impulsivity, anxiety, and depression.

Further, Dr. Hedberg testified that an adolescent raised in a family without a father had a 70 percent likelihood of ending up in a gang and in prison. Consistent with this statistic, Gomez joined a gang during his adolescence.

### c. Circumstances of Life Offense

Third, the trial court "must consider any evidence or other information in the record regarding 'the circumstances of the homicide offense, including the extent of [the juvenile defendant's] participation in the conduct and the way familial and peer pressures may have affected him.' [Citations.] Also relevant is whether substance abuse played a role in the juvenile offender's commission of the crime." (*Gutierrez, supra*, 58 Cal.4th at p. 1389, quoting *Miller, supra*, 567 U.S. at p. 477.)

The trial court concluded that while Gomez's conduct during the life offense was reprehensible, "it does not appear, standing in and of itself, to meet the language of that rare juvenile offender whose crime reflects irreparable corruption." While there was evidence showing the handgun used to kill Waterston may have been supplied by Gomez, and according to the court, Gomez was a "substantial participant" in the crime, he was not the actual killer. De Lao killed Waterston during the course of the confrontation.

### d. Incompetencies Associated With Youth

Fourth, the trial court "must consider any evidence or other information in the record as to whether the offender 'might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys.' " (*Gutierrez, supra*, 58 Cal.4th at p. 1389, quoting *Miller, supra*, 567 U.S. at pp. 477-478.) The record does not contain information pertaining to whether Gomez lacked the capacity to assist his attorneys in his defense.

### e. Possibility of Rehabilitation

Finally, the trial court "must consider any evidence or other information in the record bearing on 'the possibility of rehabilitation.' [Citations.] The extent or absence of

'past criminal history' is relevant here" (*Gutierrez, supra*, 58 Cal.4th at p. 1389, quoting *Miller, supra*, 567 U.S. at p. 478), as is the offender's postconviction conduct while in prison. (*People v. Lozano* (2016) 243 Cal.App.4th 1126, 1138; *In re Berg* (2016) 247 Cal.App.4th 418, 440.)

Prior to his incarceration, Gomez had juvenile adjudications for vehicle theft, burglary, and possession of a concealed firearm. However, his most serious offense, by far, was his commitment offense. Following his incarceration in 1996, Gomez "wasted his time until 2004." Around 2004, Gomez began taking educational classes, participating in AA and NA, and receiving work assignments.

In 2017, Gomez and another inmate allegedly threatened another inmate over a drug debt. Dr. Hedberg admitted the incident gave him pause. The trial court commented that while it recognized "the dynamic … of the prison setting … the Court is also aware of individuals who are able to set that dynamic aside and allow their conduct to reflect true rehabilitation." The court continued, "And to quote Dr. Hedberg, referring to Mr. Gomez, 'He needs to achieve a better sense of trustworthiness, so we, as the community, can have that kind of confidence in him. I think he's committed to it. I think he's on the path of it. *He's not there yet*.' " Thus, the trial court placed considerable weight upon Gomez's postconviction conduct in concluding LWOP should be reimposed.

### f. Conclusion

We acknowledge the instant case is one in which reasonable minds can disagree, the court's decision is not "so irrational or arbitrary that no reasonable person could agree with it." (*Carmony, supra,* 33 Cal.4th 367 at p. 377.) We conclude that the record does not support Gomez's assertion that the trial court abused its discretion in reimposing a sentence of LWOP.

## IV. Remand for Resentencing is Required

Although not addressed by the parties, the record shows the trial court sentenced Gomez to LWOP on count 1, but it did not orally impose a sentence on the one-year

section 12022, subdivision (a)(1) enhancement attached to this count, nor did the court impose a sentence on any of the remaining counts. Instead, the court observed that all other counts were stayed pursuant to section 654, so the available sentence was either LWOP or 25 years to life.

The trial court was required to impose a sentence on the section 12022, subdivision (a)(1) enhancement, and as to the remaining counts, to select a term, and then stay execution of the sentence on those counts. (See *People v. Salazar* (1987) 194 Cal.App.3d 634, 640.) We further observe that that the abstract of judgment and minute order from Gomez's resentencing hearing erroneously reflect that a sentence of 25 years to life was imposed on count 1, that neither document reflects what terms were selected on the stayed counts, and that the abstract of judgment fails to show the section 12022, subdivision (a)(1) enhancement was imposed. We will therefore remand the instant case back to the lower court for a full resentencing hearing.

## DISPOSITION

The sentence is vacated and this matter is remanded for resentencing. Following resentencing, the trial court shall forward a new abstract of judgment to the appropriate authorities. In all other respects, the judgment is affirmed.

SMITH, J.

WE CONCUR:


HILL, P. J.


FRANSON, J.

20.